**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| SHUA YU LE IRVING, derivatively on behalf of MICROVAST HOLDINGS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>YANG WU, FARIYAL KHANBABI, CARL T. SCHULTZ, RODNEY WORTHEN, YIXIN PAN, ISIDA TUSHE, ARTHUR WONG, and WEI YING,<br><br>Defendants,<br><br>and<br><br>MICROVAST HOLDINGS, INC.,<br><br>Nominal Defendant. | Case No.: 4:26-cv-06994<br><br>**DEMAND FOR JURY TRIAL** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Shua Yu Le Irving ("Plaintiff"), by and through Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Microvast Holdings, Inc. ("Microvast" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Yang Wu ("Wu"), Fariyal Khanbabi ("Khanbabi"), Carl T. Schultz ("Schultz"), Rodney Worthen ("Worthen"), Yixin Pan ("Pan"), Isida Tushe ("Tushe"), Arthur Wong ("Wong"), and Wei Ying ("Ying") (collectively, the "Individual Defendants" and with Microvast, "Defendants") for breaches of their fiduciary duties as controlling shareholders, directors, and/or officers of Microvast, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and against Defendants Wu, Khanbabi, Schultz, and Worthen for contribution under Sections 10(b)

and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included reviews of, among other things, the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Microvast, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This shareholder derivative action seeks to remedy wrongdoing committed by the directors and officers of Microvast between March 31, 2025 and March 16, 2026, both dates inclusive (the "Relevant Period").

2. Microvast is a Delaware corporation headquartered in Stafford, Texas that is chiefly engaged in the specialized battery industry. As such, the Company designs, develops, and fabricates high-performance lithium-ion battery components and systems. The Company primarily develops its battery products for use in electric commercial vehicles as well as energy storage systems ("ESS"). Although Microvast is headquartered in Texas, the Company conducts much of its operations in the city of Huzhou in the People's Republic of China.

3. Microvast was founded in 2006 by Defendant Wu, previously operating as a private company until July 26, 2021, when the Company merged with and into Tuscan Holdings Corporation, a special purpose acquisition company. Following the merger, Microvast became a publicly traded company on the NASDAQ stock market, trading under the ticker symbol "MVST."

4. Microvast first introduced its "ultra-fast battery system" in 2009. Since then, the Company has purportedly developed proprietary technology involving entire battery systems. The battery systems include basic battery cell components such as cathodes, anodes, electrolytes, and separators, as well as cooling systems and software controls for battery packs.

5. As noted above, the Company conducts much of its operations in Huzhou, China. To this end, the Company has invested heavily in a fully automated production facility located in Huzhou (the "Huzhou Facility"). The Huzhou Facility currently manufactures the Company's batteries through the Huzhou Phase 3.1 line, which the Company intends to expand through the addition of the Phase 3.2 line (the "Huzhou Phase 3.2 Expansion").

6. However, throughout the Relevant Period, the Individual Defendants issued materially false and misleading statements concerning, *inter alia*, the projected operational readiness of the Huzhou Phase 3.2 Expansion.

7. For instance, on March 31, 2025, just after the market closed, Microvast issued a press release to announce its financial and operational results for the fourth quarter and full year ended December 31, 2024 (the "Q4/FY 2024 Press Release"). The Q4/FY 2024 Press Release quoted Defendant Wu as stating that "***we are underway with our Huzhou Phase 3.2 expansion and anticipate to have this additional capacity online in the fourth quarter of 2025***[.]"[1]

8. The truth began to emerge on June 25, 2025, when the online publication Grizzly Research published a report titled "MVST's House of Lies: The German Factory Stands Idle, the Chinese One Runs at Half Capacity, and the CCP Owns the Shop" (the "Grizzly Report"). The Grizzly Report alleged that the Company, *inter alia*, was misrepresenting the true levels of activity at its facilities and thus inflating its business operations.

[1] All emphasis has been added unless stated otherwise.

9. On this news, the Company's stock price declined by $0.01, or roughly 0.3%, from a price per share of $3.91 at the close of trading on June 24, 2025 to close at $3.90 on June 25, 2025.

10. The truth continued to emerge on August 1, 2025, when the Company filed a current report on Form 8-K with the SEC to announce the departure of Defendant Schultz from his role as CFO of the Company.

11. On this news, the Company's stock price declined by $0.30, or roughly 9.9%, from a price per share of $3.02 at the close of trading on August 1, 2025 to close at $2.72 on August 4, 2025.

12. The truth continued to emerge on November 10, 2025, when the Company issued a press release to announce its financial and operational results for the third quarter of 2025 (the "Q3 2025 Press Release"). The Q3 2025 Press Release announced, *inter alia*, that the additional production capacity from the Huzhou Phase 3.2 Expansion would not come online until the end of the year.

13. On this news, the Company's stock price declined by $0.50, or roughly 10%, from a price per share of $4.98 at the close of trading on November 10, 2025 to close at $4.48 on November 11, 2025.

14. The truth finally emerged on March 16, 2026, when the Company filed its Annual Report on Form 10-K with the SEC to report its financial and operational results for the fourth quarter and full year ended December 31, 2025 (the "2025 10-K"). That same day, the Company issued a press release to announce its financial and operational results for the fourth quarter and full year ended December 31, 2025 (the "Q4/FY 2025 Press Release"), and hosted an earnings call to discuss the same results with investors and analysts (the "Q4/FY 2025 Earnings Call"). During

the Q4/FY 2025 Earnings Call, Defendant Wu provided an update as to the Huzhou Phase 3.2 Expansion. Despite the Individual Defendants' repeated assertions throughout the Relevant Period that the Huzhou Phase 3.2 Expansion would be operational in 2025, Defendant Wu announced during the Q4/FY 2025 Earnings Call that the "Huzhou Phase 3.2 expansion . . . [is] on track to achieve serial production in 2026."

15. On this news, the Company's stock price declined by $0.79, or roughly 34.2%, from a price per share of $2.31 at the close of trading on March 16, 2026 to close at $1.52 on March 17, 2026.

16. Throughout the Relevant Period, the Individual Defendants breached their fiduciary duties to the Company by personally making and/or causing Microvast to make a series of materially false and misleading statements regarding the Company's business, operations, and prospects to the investing public. The Individual Defendants willfully or recklessly made and/or caused Microvast to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company overstated the activity and production levels at its facilities notably including the Huzhou Facility; (2) the Company would be unable to complete the Huzhou Phase 3.2 expansion by the end of 2025; (3) the Company would be unable to reach its margin targets; (4) as a result of its specialized ESS components, the Company would incur roughly $32.5 million in inventory impairment charges; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

17. The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact.

18. In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by failing to maintain adequate internal controls while Defendant Pan engaged in improper insider sales while the Company's stock price was artificially inflated, netting combined total proceeds of approximately $34,778.

19. In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO") and Chairman of the Board, its current Chief Financial Officer ("CFO"), and two of its former CFOs to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of Texas (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

20. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of Defendants Wu's, Khanbabi's, Schultz's, and Worthen's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)) and Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15 U.S.C. §§ 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

22. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

23. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

24. Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District. In addition, the Company's principal executive offices are in this District.

## PARTIES

### Plaintiff

25. Plaintiff Shua Yu Le Irving is a current shareholder of Microvast and has continuously held Microvast common stock at all relevant times.

### Nominal Defendant Microvast

26. Microvast is a Delaware corporation with its principal executive offices at 2929 Briarpark Drive, Suite 400, Houston, Texas 77042. The Company's shares trade on the NASDAQ under the ticker symbol "MVST."

**Defendant Wu**

27. Defendant Wu founded Microvast in 2006 and has since served as Microvast's CEO and Chairman of the Board. Previously, Defendant Wu served as President of Microvast from October 2006 to April 14, 2022, from January 10, 2023 to August 3, 2023, and from February 5, 2024 through April 17, 2024. According to the Company's annual report on Form 10-K dated March 16, 2026, as of March 9, 2026, Defendant Wu beneficially owned 145,645,784 shares of Microvast stock, representing 37.3% of the Company's outstanding common stock, thus making Defendant Wu a controlling shareholder of Microvast. On March 9, 2026, Microvast's common stock price at the close of trading was $2.10, thus Defendant Wu owned approximately $305.9 million worth of Microvast stock as of that date.

28. The Company's Schedule 14A filed with the SEC on September 10, 2025 (the "2025 Proxy Statement") stated the following about Defendant Wu, in relevant part:

> *Yang Wu* was elected to our Board as a Class III director in 2021 and was re-elected in 2024 and serves as our Chief Executive Officer and Chairman of the Board. Mr. Wu is the founder of Microvast and has been its Chairman and Chief Executive Officer since its inception in October 2006. Mr. Wu also served as President of the Company from its inception through April 14, 2022, from January 10, 2023 to August 3, 2023 and from February 5, 2024 through April 17, 2024. From 2000 to 2006, Mr. Wu served as chief executive officer at Omex Environmental Engineering Co., Ltd., a water treatment company, which he founded and was acquired by Dow Chemical Company in 2006. From 1996 to 2000, Mr. Wu served as chief executive officer and founder of Omex Engineering and Construction Inc. Prior to Omex Engineering and Construction, from 1989 to 1996, Mr. Wu was the founder of World Wide Omex, Inc., an agent for a large oilfield service company. Mr. Wu received his bachelor's degree from Southwest Petroleum University, Chengdu.

(Emphasis in original).

**Defendant Khanbabi**

29. Defendant Khanbabi served as the Company's CFO from October 21, 2024 until April 7, 2025.

30. The current report on Form 8-K the Company filed with the SEC on October 18, 2024, stated the following about Defendant Khanbabi, in relevant part:

> Ms. Khanbabi, age 57, previously served as Group Chief Executive Officer of Dialight PLC (LSE: DIA) starting in August 2019. Prior to her promotion to CEO of Dialight, she held the position of Group Chief Financial Officer from September 2014 to August 2019. Prior to her tenure at Dialight, Ms. Khanbabi held several senior finance leadership roles, including serving as Chief Financial Officer at Harvest Energy from March 2009 to August 2014 and as Chief Financial Officer at Britannia Bulk Inc. from August 2006 to March 2009.

**Defendant Schultz**

31. Defendant Schultz served as the Company's CFO from April 21, 2025 until July 29, 2025.

32. The current report on Form 8-K the Company filed with the SEC on April 9, 2025, stated the following about Defendant Schultz, in relevant part:

> Mr. Schultz, age 46, previously served as Chief Financial Officer ("CFO"), North America for Air Liquide starting in 2022. Prior to his promotion to CFO, North America, he held the position of CFO, Air Liquide Advanced Materials from 2017 to 2022. Prior to his roles at Air Liquide, Mr. Schultz held several finance leadership roles, including as Director of Finance and Administration at SAE Towers from 2013 to 2014 and Director of Capital Management and Business Development, Genworth Mortgage Insurance at Genworth Financial from 2010 to 2013.

**Defendant Worthen**

33. Defendant Worthen has served as the Company's CFO and Vice President of Corporate Strategy since January 7, 2026. Defendant Worthen previously served as the Company's Director of Investor Relations and FP&A, Vice President of Corporate Finance, and Head of FP&A and Investor Relations. More recently, Defendant Worthen also served as the Company's interim CFO from August 7, 2025 until January 7, 2026.

34. The current report on Form 8-K the Company filed with the SEC on January 9, 2026 stated the following about Defendant Worthen, in relevant part:

> Mr. Worthen, age 35, joined the Company in June of 2023. Prior to serving as the Company's Interim Chief Financial Officer and Vice President of Corporate Strategy, he held various positions of increasing responsibility within the Company, including Director of Investor Relations and FP&A, Vice President of Corporate Finance, and Head of FP&A and Investor Relations. Prior to joining the Company, Mr. Worthen gained extensive experience in financial reporting, M&A, corporate development, and strategic leadership, serving as Director of Finance at Killam Holdings Company and various roles of progressive responsibility in M&A, FP&A, and engineering at both private and publicly listed energy companies. Mr. Worthen holds a Bachelor of Science in Mechanical Engineering from the University of Central Oklahoma, a Master of Science in Engineering from the University of Oklahoma and a Master of Science in Finance and Master of Business Administration from Auburn University.

**Defendant Pan**

35. Defendant Pan has served as a Company director since October 18, 2024. Defendant Pan currently serves as the Chair of the Compensation Committee, as the Chair of the Nominating and Corporate Governance Committee, and as a member of the Audit Committee.

36. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Pan made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share | Proceeds |
|---|---|---|---|
| December 31, 2025 | 11,935 | $2.76 | $32,941 |
| December 31, 2025 | 661 | $2.78 | $1,838 |

Thus, in total, before the fraud was exposed, Defendant Pan sold 12,596 shares of Company stock on inside information, for which she received approximately $34,778 in total proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

37. The 2025 Proxy Statement stated the following about Defendant Pan, in relevant part:

> *Yixin Pan* was elected to the Board as a Class III director in 2024. Ms. Pan has over 25 years of experience in tech innovation, entrepreneurship, operations, marketing, investment banking, and M&A across multiple industries and for Fortune 500 companies and small emerging technology startups. Most recently, Ms. Pan previously served as a board member, audit committee member, and the committee chair of the Nomination, Governance and Compensation Committee and the Technology Committee of VIQ Solutions (TSX:VQS). Ms. Pan has served as managing partner of XTVUE, LLC., a boutique investment bank and management consulting firm, since 2008. Ms. Pan earned a Master of Business Administration from Cornell University and a Master of Science in Mechanical Engineering from Northern Illinois University.

(Emphasis in original).

**Defendant Tushe**

38. Defendant Tushe has served as a Company director since October 18, 2024. Since April 18, 2024, Defendant Tushe has also served as the Company's President. She has also served as Microvast's General Counsel since March 15, 2023, and as the Company's Corporate Secretary since May 8, 2023.

39. The 2025 Proxy Statement stated the following about Defendant Tushe, in relevant part:

> *Isida Tushe* was elected to the Board as a Class III director in 2024 and serves as our President, General Counsel and Corporate Secretary. Ms. Tushe has served as the Company's General Counsel since March 15, 2023 and as the Company's Corporate Secretary since May 8, 2023 and was appointed as President of the Company on April 18, 2024. Prior to joining the Company, Ms. Tushe served as the General Counsel and Corporate Secretary at DC Green Bank and mPhase Technologies, Inc., where she oversaw all legal and compliance matters. Prior to that, Ms. Tushe served as the General Counsel of FFP New Hydro LLC, a developer of low-impact hydroelectric energy generation and storage in the United States, overseeing all legal and lobbying functions. Ms. Tushe has also held various senior positions involving finance, commercial and legal aspects of structured finance, M&A, project finance and development, intellectual property and corporate governance, including as VP and Senior Counsel at Pine Gate Renewables, LLC and as VP of Project Finance and Counsel at Fuel Cell Energy, Inc.

(Emphasis in original).

**Defendant Wong**

40. Defendant Wong has served as a Company director since July 23, 2021. Defendant Wong currently serves as the Chair of the Audit Committee, as a member of the Compensation Committee, and as a member of the Nominating and Corporate Governance Committee.

41. The 2025 Proxy Statement stated the following about Defendant Wong, in relevant part:

> *Arthur Wong* was elected to the Board as a Class II director in 2021 and was re-elected in 2023. Mr. Wong currently serves as an independent director and Chairman of the audit committee of Daqo New Energy Corp. (NYSE: DQ). From March 2019 to June 2024, Mr. Wong served as an independent director of Canadian Solar Inc. (NASDAQ: CSIQ). From March 2020 to March 2022, Mr. Wong served as an independent director of Tarena International, Inc. (NASDAQ: TEDU). From 2008 to 2018, Mr. Wong served as the Chief Financial Officer for Asia New-Energy, Nobao Renewable Energy, GreenTree Inns Hotel Management Group and Beijing Radio Cultural Transmission Company Limited, sequentially. From 1982 to 2008, Mr. Wong worked for Deloitte Touche Tohmatsu in Hong Kong, San Jose and Beijing over various periods of time, with his last position as a partner in the Beijing office. Mr. Wong received a bachelor's degree in applied economics from the University of San Francisco and a higher diploma of accountancy from Hong Kong Polytechnic University. He is a member of the American Institute of Certified Public Accountants, the Association of Chartered Certified Accountants and the Hong Kong Institute of Certified Public Accountants.

(Emphasis in original).

**<u>Defendant Ying</u>**

42. Defendant Ying has served as a Company director since July 23, 2021. Defendant Ying also serves as a member of the Audit Committee, as a member of the Compensation Committee, and as a member of the Nominating and Corporate Governance Committee.

43. The 2025 Proxy Statement stated the following about Defendant Ying, in relevant part:

> *Wei Ying* was elected to the Board as a Class I director in 2021 and was re-elected in 2022. Since December 2014, Mr. Ying has been a managing partner and director of CDH Shanghai Dinghui Bai Fu Investment Management Co., Ltd., a key investment manager entity under CDH Investment, and certain of its affiliates. Mr. Ying has served as a director of CHTC Fong's Industries Company Limited (HKG:

> 0641) since September 2011, a director of Fountain Set (Holdings) Limited (HKG: 0420) since January 2015, a director of Zhongsheng Group Holdings Limited (OTCMKTS: ZSHGY) since December 2016, and a director of Beijing East Environment, Energy Technology Co., Ltd. (NEEQ: 831083) since December 2016, in addition and as a director of several private companies. Mr. Ying received a bachelor's degree in Economics from Zhejiang Gongshang University and a Master of Business Administration from the University of San Francisco School of Management.

(Emphasis in original).

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

44. By reason of their positions as controlling shareholders, officers, directors, and/or fiduciaries of Microvast and because of their ability to control the business and corporate affairs of Microvast, the Individual Defendants owed Microvast and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Microvast in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Microvast and its shareholders so as to benefit all shareholders equally.

45. Each controlling shareholder, director, and officer of the Company owes to Microvast and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

46. The Individual Defendants, because of their positions of control and authority as controlling shareholders, directors and/or officers of Microvast, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

47. To discharge their duties, the controlling shareholders, officers and directors of Microvast were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

48. Each Individual Defendant, by virtue of his or her position as a controlling shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholders, directors, and officers of Microvast, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also controlling shareholders, officers, and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Microvast's Board at all relevant times.

49. As controlling shareholders, senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

50. To discharge their duties, the controlling shareholders, officers, and directors of Microvast were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the controlling shareholders, officers, and directors of Microvast were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Texas, and the United States, and pursuant to Microvast's own Code of Ethics (the "Code of Ethics");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Microvast conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Microvast and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Microvast's operations would comply with all applicable laws and Microvast's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements

made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

51. Each of the Individual Defendants further owed to Microvast and the shareholders the duty of loyalty requiring that each favor Microvast's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

52. At all times relevant hereto, the Individual Defendants were the agents of each other and of Microvast and were at all times acting within the course and scope of such agency.

53. Because of their advisory, executive, managerial, directorial, and controlling positions with Microvast, each of the Individual Defendants had access to adverse, non-public information about the Company.

54. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Microvast.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

55. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants

caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

56. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (1) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (2) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (3) artificially inflate the Company's stock price.

57. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Microvast was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

58. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

59. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Microvast and was at all times acting within the course and scope of such agency.

## MICROVAST'S CODE OF ETHICS

60. Microvast's Code of Ethics "sets forth requirements for honest and ethical conduct, ensures compliance with applicable governmental laws, rules and regulations and provides accountability for adherence" to the Code of Ethics. The Code of Ethics "applies to the directors, officers and employees of the Company ("Covered Persons") and should be provided to and followed by the Company's agents, representatives and consultants." The Code of Ethics notes that "[v]iolations of this Code may result in disciplinary action, varying from reprimand to termination."

61. The Code of Ethics further states that the "Company's good name and reputation depend, to a very large extent, upon you taking personal responsibility for maintaining and adhering to the policies and guidelines set forth in this Code. Your conduct on behalf of the Company must be guided by the ethical principles, policies and guidelines set forth in this Code."

62. Regarding "Conflicts of Interest," the Code of Ethics provides, in relevant part:

> A conflict of interest is a situation where a Covered Person's personal or professional interests (or those of an immediate family member or other close relative or friend or any other person who may act on such Covered Person's behalf) can affect his or her ability to act in the Company's best interests or interfere (or appear to interfere) with his or her personal objectivity and obligations to the Company. All Covered Persons should engage in honest and ethical conduct, including avoiding any actual or apparent conflicts of interest. All Covered persons are charged with acting in the Company's best interests at all times. Employees and officers may not hold outside employment that interferes with their job performance at the Company. Officers and directors should also refer to the Company's Related Party Transactions Policy for additional information. Consistent with the rules of the Nasdaq Stock Market ("Nasdaq") and Section XIV below, any waiver of this conflict of interest policy for a director or executive officer of Microvast Holdings may only be made by the Board of Directors of Microvast Holdings (the "Board"),

and any such waiver should be promptly disclosed to the stockholders of Microvast Holdings.

All Covered Persons are obligated to continually evaluate their personal and employment situations and promptly report to the Compliance Officer any material transaction or relationship that could be expected to give rise to an actual or apparent conflict of interest.

If you become aware of a business or financial opportunity as part of your work with the Company, you are not permitted to use any such information or usurp that opportunity for your own personal gain. You may not use Company property or information or your position with the Company for personal gain and should not compete with the Company or any of its affiliates directly or indirectly.

63. Regarding "Record-Keeping," the Code of Ethics provides:

The Company requires honest and accurate recording and reporting of information in order to make responsible business decisions, and it documents and records business expenses accurately. Questionable expenses should be discussed with the appropriate personnel in the Company's accounting department. All of the Company's books, records, accounts and financial statements are maintained in reasonable detail, appropriately reflect its transactions and conform both to applicable legal requirements and to the Company's system of internal controls.

The Company avoids exaggeration, derogatory remarks, guesswork or inappropriate characterizations of people and companies in its business records and communications. The Company maintains its records according to its record retention policies. In accordance with those policies, in the event of any litigation or governmental investigation concerning the Company's records or communications, please consult with the Compliance Officer if you have any questions.

64. Regarding "Public Reporting," the Code of Ethics provides, in relevant part:

Microvast Holdings is a public company and, as a result, files reports and other documents with the United States Securities and Exchange Commission (the "SEC") and Nasdaq, on which its common stock trades. In addition, Microvast Holdings issues press releases and makes other public statements in accordance with its Corporate Disclosure Policy that include financial and other information about the Company's business, financial condition and results of operations. Microvast Holdings endeavors to make full, fair, accurate, timely and understandable disclosures in reports and documents it files with, or submits to, the SEC and in its press releases and public communications.

The Company requires cooperation and open communication with its auditors. It is illegal to take any action to fraudulently influence, coerce, manipulate or mislead

any auditor engaged in the performance of an audit of the Company's financial statements.

The laws and regulations applicable to filings made with the SEC, including those applicable to accounting matters, are complex. While the ultimate responsibility for the information included in these filings rests with Company management, numerous other employees participate in the preparation of these filings or provide information included in these filings. The Company maintains disclosure controls and procedures to ensure that the information included in these filings is collected and communicated to Company management in order to permit timely disclosure of such information.

If you are requested to provide, review or certify information in connection with the preparation of a filing to be made with the SEC, you must provide the requested information in a full, accurate and timely manner. Moreover, even in the absence of a specific request, you should report any significant information that you believe should be considered for disclosure in Microvast Holdings' filings with the SEC.

65. Regarding "Competition and Fair Dealing," the Code of Ethics provides:

The Company competes fairly and honestly. The Company does not engage in unethical or illegal business practices such as stealing proprietary information, possessing trade secret information that was obtained without the owner's consent or inducing disclosure of this type of information by past or present employees of other companies.

66. Regarding "Compliance with Laws, Rules and Regulations," the Code of Ethics provides:

The Company is obligated to comply with all applicable laws, rules and regulations, including with respect to human rights, forced labor, child labor, human trafficking, bribery, discrimination, harassment and pay equity. The Company strives to conduct its business ethically and in a way that demonstrates respect for globally recognized human rights and the dignity of all people. It is the personal responsibility of each Covered Party to adhere to the standards and restrictions imposed by these laws, rules and regulations in the performance of his or her duties for the Company. Company management is also required to promote compliance with the Code by all employees and to abide by Company standards, policies and procedures.

67. Regarding "Insider Trading," the Code of Ethics provides, in relevant part:

Trading on inside information is a violation of federal securities law. Covered Parties in possession of material, non-public information about the Company or companies with whom it does business must abstain from trading or advising others

> to trade in the respective company's securities from the time that they obtain such material, non-public information until adequate public disclosure has been made regarding such information. Information is considered "material" if there is a substantial likelihood that a reasonable investor would consider it important in making a decision to buy, sell or hold a security or where such information is likely to have a significant effect on the market price of the security. To use non-public information for personal financial benefit or to "tip" others, including family members, who might make an investment decision based on this information is not only unethical but also illegal. Covered Parties who trade stock based on material, non-public information can be personally liable for damages totaling up to three times the profit made or loss avoided by the respective Covered Party.

68. Regarding "Reporting Illegal or Unethical Behavior," the Code of Ethics provides, in relevant part:

> In order to encourage the reporting of illegal or unethical behavior (including violations of this Code), the Company keeps all reports confidential and does not allow retaliation for good faith reports of possible misconduct by others. It is also the duty of the Company to cooperate in internal investigations of alleged misconduct. If you observe or suspect any corrupt activity, please contact the Compliance Officer immediately to report such activity. The Company does not tolerate retaliation against anyone who makes such a report in good faith.

69. Regarding "Waivers" of the Code of Ethics, the Code of Ethics provides:

> Consistent with Nasdaq rules, only the Board may waive a provision of this Code for the executive officers or directors of Microvast Holdings, and any waiver should be promptly disclosed to the stockholders of Microvast Holdings. Waivers of this Code for any other Company employee may be made only by the Chief Executive Officer or the Compliance Officer, and then only under special circumstances.

70. In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including, but not limited to, violations of Section 14(a) of the Exchange Act, breaches of fiduciary duty, gross mismanagement, unjust enrichment, waste of corporate assets, and abuse of control. Also, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code

of Ethics, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## MICROVAST'S AUDIT COMMITTEE CHARTER

71. The Company also maintains an audit committee charter (the "Audit Committee Charter"). The Company's Audit Committee Charter states that the "purposes" of the Audit Committee are to:

> • oversee the accounting and financial reporting processes of the Company and the audits of the Company's financial statements;
>
> • take, or recommend that the Board take, appropriate action to oversee (1) the qualifications, independence and performance of the Company's independent auditors, and (2) the performance of the Company's internal audit function;
>
> • prepare the report required by the rules of the United States Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement;
>
> • review any proposed related party transactions and approve, ratify or disallow each such proposed transaction;
>
> • review any proposed pre-arranged trading plans to be entered into by Covered Persons (as defined in the Insider Trading Policy) pursuant to SEC rule 10b5-1(c) and approve, ratify or disallow each such proposed trading plan;
>
> • approve reimbursement of expenses incurred by Company management in identifying potential target businesses; and
>
> • oversee and review the Company's guidelines and policies that govern the process by which the Company's exposure to risk is assessed and managed by Company management.

72. The Audit Committee Charter also describes the Audit Committee's responsibilities. The Audit Committee Charter states that the Audit Committee shall review the Company's public filings:

> The Committee shall review and discuss with Company management (including the Senior Accounting Executives) and with the independent auditors the Company's annual and quarterly audited financial statements, including (a) all

> critical accounting policies, practices and controls used or to be used by the Company and any other matters required by Sections 302 and 404 of the Sarbanes-Oxley Act of 2002 and the rules promulgated thereunder by the SEC, (b) the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" prior to the filing of the Company's Annual Report on Form 10-K and (c) any significant financial reporting issues that have arisen in connection with the preparation of such audited financial statements.

73. The Audit Committee Charter states that the Audit Committee shall review the following, in relevant part:

> (i) any analyses prepared by Company management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements. The Committee may consider the ramifications of the use of such alternative disclosures and treatments on the financial statements and the treatment preferred by the independent auditors. The Committee may also consider other material written communications between the independent auditors and Company management, such as any management letter or schedule of unadjusted differences;
>
> (ii) major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies, as well as the Company's disclosures regarding internal controls;
>
> (iii) major issues regarding accounting principles and procedures and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; and
>
> (iv) the effects of regulatory and accounting initiatives, as well as offbalance sheet transactions and structures, on the financial statements of the Company.

74. The Audit Committee Charter states that the Audit Committee shall discuss the following with the CEO and CFO, in relevant part:

> The Committee shall discuss with the Chief Executive Officer and Chief Financial Officer of the Company (1) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act, within the time periods specified in the SEC's rules and forms, and (2) any fraud involving Company management or other employees who have a significant role in the Company's internal control over financial reporting.

75. Regarding the Company's "Unaudited Quarterly Financial Statements," the Audit Committer Charter provides:

> The Committee shall discuss with Company management and the independent auditors, prior to the filing of the Company's Quarterly Reports on Form 10-Q, (1) the Company's quarterly financial statements and the Company's related disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," (2) such issues as may be brought to the Committee's attention by the independent auditors pursuant to Statement on Auditing Standards No. 100 and (3) any significant financial reporting issues that have arisen in connection with the preparation of such financial statements.

76. Regarding the Company's "Earnings Press Releases," the Audit Committer Charter provides:

> The Committee shall discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies, including, in general, the types of information to be disclosed and the types of presentations to be made (paying particular attention to the use of "pro forma" or "adjusted" non-GAAP information).

77. Regarding the Company's "Risk Assessment and Management," the Audit Committer Charter provides:

> • The Committee shall discuss the guidelines and policies that govern the process by which the Company's exposure to risk is assessed and managed by Company management.
>
> • In connection with the Committee's discussion of the Company's risk assessment and management guidelines, the Committee may discuss or consider the Company's major financial and accounting risk exposures or other exposures and the steps that Company management has taken to monitor and control such exposures.
>
> • The Committee shall periodically meet with the Compliance Officer to review and discuss any reports of wrongdoing or inappropriate conduct received directly by the Compliance Officer or through the Company's Whistleblower Hotline and any risk exposures in connection therewith.

78. Regarding "Regular Reports to the Board," the Audit Committee Charter provides:

> • The Committee shall periodically obtain reports from Company management and the independent auditors that the Company and its subsidiaries/foreign affiliated entities are in conformity with applicable legal requirements and the Company's Code of Ethics.
>
> • The Committee shall regularly report to and review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the independent auditors, the performance of the internal audit function and any other matters that the Committee deems appropriate or is requested to review for the benefit of the Board.

79. Regarding the Company's "Legal and Regulatory Compliance," the Audit Committer Charter provides:

> • The Committee shall discuss with Company management or outside legal counsel and the independent auditors and review with the Board the legal and regulatory requirements applicable to the Company and its subsidiaries and the Company's compliance with such requirements. After these discussions, the Committee may, if it determines it to be appropriate, make recommendations to the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations.
>
> • The Committee shall discuss with Company management any legal matters (including pending or threatened litigation) that may have a material effect on the Company's financial statements or its compliance policies and procedures.

80. Defendants Wong (as Chair), Pan, and Ying violated the Audit Committee Charter by engaging in or permitting the Company to engage in the scheme to issue materially false and misleading statements to the investing public and by facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to oversee risks related to financial

reporting, internal controls, and internal information systems, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

***Relevant Background***

81. Microvast is a company which designs, develops, and manufactures lithium-ion battery components and systems. Although Microvast is headquartered in Texas, the Company conducts much of its operations in the city of Huzhou in the People's Republic of China. The Company's battery technology is chiefly marketed for use in commercial electric vehicles and ESS.

82. Microvast's business model emphasizes vertical integration, and to that end the Company's technology encompasses all levels of battery development from core cell materials to management systems. This includes basic battery cell components such as cathodes, anodes, electrolytes, and separators, as well as cooling systems and software controls for battery packs.

83. The Company markets its products to several bus platforms including Citybus and Crossway, and sells its battery technologies within the port and mining industries to customers such as Kalmar Corp. The Company purports that its electric commercial vehicle battery technology can provide roughly 10% to 80% charging in under thirty minutes. One of the Company's notable products is its high-energy NMC 53.5Ah battery cell (the "NMC Battery Cell"), intended for long-range commercial vehicle and ESS applications.

84. To fully develop and market the NMC Battery Cell, Microvast has invested heavily in the Huzhou Facility. The Huzhou Facility currently produces batteries through the Company's Huzhou Phase 3.1 line, which the Company intends to expand through the addition of the Phase

3.2 line. The Company has stated that it expects the Phase 3.2 line's equipment installation to conclude in 2026.

85. As of December 31, 2025, the Company purported to have an annual manufacturing capacity of roughly "3.5 GWh of cell, module and pack capacity, 600 tons of annual cathode capacity, 3,000 tons of annual electrolyte capacity and 5 million square meters of annual separator material capacity[.]"[2] The Company has noted that the manufacturing capacity noted above derives solely from the Huzhou Facility.

86. The Company markets its products according to three regional categories: Europe, the Middle East, and Africa ("EMEA"); North and South America; and Asia & Pacific. Microvast's revenue mix has shifted substantially towards the EMEA region, with the EMEA region accounting for the largest portion of the Company's revenue in both 2025 and 2024.

87. On April 9, 2025, the Company filed a current report on Form-8K with the SEC (the "CFO Transition 8-K") which noted that on April 7, 2025, Defendant Khanbabi "ceased to be employed as Chief Financial Officer of [the Company]." The CFO Transition 8-K further announced the appointment of Defendant Schultz as the Company's CFO.

## FALSE AND MISLEADING STATEMENTS

***March 31, 2025 Press Release and Earnings Call***

88. On March 31, 2025, just after the market closed, Microvast issued the Q4/FY 2024 Press Release. The Q4/FY 2024 Press Release quoted Defendant Wu concerning the timeline for the Huzhou Phase 3.2 Expansion and the Company's overall performance for the year, stating the following, in relevant part:

> We achieved record quarterly revenue in the fourth quarter of 2024, beating revenue guidance. This brings our full year revenue growth to 23.9% and we delivered these

[2] Microvast Holdings, Inc., Annual Report (Form 10-K), at 5 (Mar. 16, 2026).

> revenues at a gross margin also above guidance. The revenue growth achieved in [Europe, Middle East, and Africa ("EMEA")] is encouraging and we would expect to continue this growth into 2025," said Yang Wu, Microvast's Founder, Chairman, and Chief Executive Officer. "***In [Asia & Pacific Region ("APAC")], we are underway with our Huzhou Phase 3.2 expansion and anticipate to have this additional capacity online in the fourth quarter of 2025*** to meet increasing customer demand as we prioritize uncovering new opportunities and market segments. Our backlog has grown to $401.3 million as regional demand for our technology continues to rapidly grow. We have realized great successes in the global heavy industrials segment and the maturing Korean market. The significant strides we've made in operational efficiencies in the second half of 2024 will continue into 2025 as our core focus remains on achieving sustainable profitability.

89. Also on March 31, 2025, after the market closed, the Company hosted an earnings call to discuss its financial results for the fourth quarter and full year ended December 31, 2024 with investors and analysts (the "Q4/FY 2024 Earnings Call"). During the Q4/FY 2024 Earnings Call, Defendant Wu updated investors on the progress on the Huzhou Phase 3.2 Expansion, stating the following in relevant part:

> We are happy to give a progress update on our Huzhou Phase 3.2 expansion project. This new line should give us up to an additional 2 gigawatt hour per year of production capacity in order to meet the high demand for our products. Cleanroom utilities and equipment installation are all well underway. The expansion leverages our existing infrastructure and expertise and will help enable us to produce both current and future technologies. ***We anticipate first qualified production to come online in the fourth quarter of 2025***.

90. In addition, during the Q4/FY 2024 Earnings Call, Defendant Khanbabi stated the following regarding the Company's gross margin figures, in relevant part:

> Gross profit for Q4 2024 was $41.5 million, up from $23 million in Q4 2023, an 80% improvement ***driven by operational efficiencies, increased utilization and disciplined cost control implementation***. This resulted in a gross margin of 36.6% compared to 22% in the prior year period, a 14.6 percentage point improvement. For the full year, gross profit was $119.6 million, more than double the prior year's $57.2 million, reflecting a 109% increase. Gross margin for the full-year 2024 was 31.5%, up from 18.7% in 2023, a 12.8 percentage point improvement, ***reflecting operating leverage and continued efficiency gains***.

91. During the Q4/FY 2024 Earnings Call, Defendant Khanbabi also noted reasons for investors to expect increased Company margins, stating the following in relevant part:

> In Asia Pacific, revenue declined from $219.1 million in 2023 to $177.7 million in 2024, a 19% year-over-year decrease. ***This decline is aligned with our strategic repositioning away from low-margin segments*** in China and India, where price competition remains intense with lower-priced LFP options. ***Our focus has shifted towards more profitable, higher-value opportunities***, especially in regions that emphasize technology differentiation over commoditization.

92. Moreover, during the Q4/FY 2024 Earnings Call, Defendant Wu doubled down on his earlier remarks concerning the Company's gross margin and the progress of the Huzhou Phase 3.2 Expansion, stating the following in relevant part:

> We expect 2025 revenue to increase 18% to 25% year-over-year. This puts our revenue guidance in the range of $450 million to $475 million. ***We also aim to maintain a gross margin target of 30%***. ***For our APAC business, we continue to target production capacity improvements at our Huzhou facility to meet increasing customer demand. Our Phase 3.2 expansion is anticipated to come online later this year***, which is expected to give us up to 2 gigawatt hour of additional capacity across a variety of our high-performance products. . . . To summarize, 2024 was a year of significant progress and strategic realignment for Microvast. We achieved record revenues, demonstrating the strong global demand for our high-performance battery solutions, particularly in EMEA region. ***We have significantly improved our gross margins*** and delivered positive adjusted EBITDA in the second-half of the year. Similarly, ***a clear shift towards sustainable profitability***.

***May 12, 2025 Press Release and Earnings Call***

93. On May 12, 2025, the Company issued a press release to announce its financial and operational results for the first quarter of 2025 (the "Q1 2025 Press Release"). The Q1 2025 Press Release discussed the Company's "2025 Outlook," stating the following in relevant part:

> 2025 Outlook: . . . Through 2025, with continued regional efficiencies and utilization increases, the Company is targeting a gross margin of 30%; Installation of production equipment for Huzhou Phase 3.2, increasing our capacity to meet strong customer demand and targeting first qualified products in Q4 2025[.]

94. Also on May 12, 2025, the Company hosted an earnings call to discuss its financial results for the first quarter of 2025 (the "Q1 2025 Earnings Call"). During the Q1 2025 Earnings Call, Defendant Wu provided another update as to the Huzhou Phase 3.2 Expansion, stating the following in relevant part:

> I'd like to provide an update to our Phase 3.2 expansion. ***The clean rooms are nearly completed, utility equipment installation is complete, and we are currently installing the production equipment. Our Huzhou Phase 3.2 expansion project is on track*** to add up to two gigawatt-hours of annual production capacity, strategically positioned to, address the strong market demand for our solutions. This expansion leverages our established infrastructure and deep expertise, enabling the production of both our current and next-generation battery technologies. ***We anticipate achieving the first qualified production from this new line in the fourth quarter of 2025***.

95. Also during the Q1 2025 Earnings Call, Defendant Wu discussed the Company's gross margin target and year-end revenue guidance, stating the following in relevant part:

> While we remain optimistic about our trajectory this past quarter presented headwinds, preliminarily due to global supply chain, uncertainties and trade disruptions, which have impacted the rollout time lines for certain light commercial vehicle platforms. . . . As we look ahead through the remainder of 2025, our initial guidance remains an anticipated year-over-year revenue increase of 18% to 25%, placing our target range between $450 million and $475 million. We also continue to aim for full year gross margin of approximately 30%.

96. Moreover, during the Q1 2025 Earnings Call, Defendant Worthen discussed the Company's financial performance for the first quarter of 2025, in particular the Company's EMEA business. More specifically, Defendant Worthen emphasized the Company's EMEA business performance as "key customers continue to ramp their vehicle production," noting, *inter alia*, that "[o]ur EMEA business grew by 108% year-over-year and accounted for 52% of our quarterly revenue, up from 36% a year ago as we continue to grow our partnerships and key customers continue to ramp their vehicle production."

97. Later on in the Q1 2025 Earnings Call, Defendant Wu reaffirmed the Company's previously stated gross margin guidance and Huzhou Phase 3.2 Expansion expectations, stating the following in relevant part:

> As we look ahead through the remainder of 2025, our initial guidance remains an anticipated year-over-year revenue increase of 18% to 25%, placing our target range between $450 million and $475 million. We also continue to aim for full year gross margin of approximately 30%. ***Our APAC operations are focused on bringing the Phase 3.2 expansion, at our Huzhou facility online, later this year***. ***This additional capacity*** expected to reach up to 2 gigawatt hour annually, ***will be crucial*** in meeting the robust customer demand, across our diverse portfolio.

98. The statements identified in ¶¶ 88-97 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) the Company overstated the activity and production levels at its facilities notably including the Huzhou Facility; (2) the Company would be unable to complete the Huzhou Phase 3.2 expansion by the end of 2025; (3) the Company would be unable to reach its margin targets; (4) as a result of its specialized ESS components, the Company would incur roughly $32.5 million in inventory impairment charges; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

## **THE TRUTH BEGINS TO EMERGE AS FALSE AND MISLEADING STATEMENTS CONTINUE**

***June 25, 2025 Grizzly Research Report***

99. On June 25, 2025, Grizzly Research published the Grizzly Report. The Grizzly Report alleged that the Company was "fabricating a significant of its business and capabilities[]"[3]

---

[3] "MVST's House of Lies: The German Factory Stands Idle, the Chines One Runs at Half Capacity, and the CCP Owns the Shop," GRIZZLY RESEARCH (Jun. 25, 2025 10:10 AM),

through, *inter alia*, inflating the activity levels of its facilities such as the Huzhou Facility as well as the Company's prospects surrounding its commercial partnerships.

100. In particular, the Grizzly Report noted several inconsistencies in the Company's claims pertaining to its employee headcounts. For instance, the Grizzly Report discussed a document published by the Chinese government indicating that the number of employees at the Huzhou Facility fell by roughly 400 "over a period when MVST announced its Huzhou Phase 3.1 expansion being in full operation."[4]

101. Further, the Grizzly Report reported that while the Company responded to a different short seller report in November 2023 by stating its "manufacturing plant in Huzhou, China has more than 2,500 employees[,]" the Company's Annual Report on Form 10-K filed with the SEC on April 1, 2024 stated that "[a]s of December 31, 2023, [Microvast] had 2,006 full-time employees and 955 independent contractors."[5]

102. Moreover, the Grizzly Report reported that the "vast majority [of the Company's] commercial counterparts . . . are tiny startups or prototype partnerships showing insignificant economic opportunities."[6] For instance, the Grizzly Report noted the Company purported that it would sell over $450 million in electric and hydrogen truck batteries to a company called Gaussin. However, the Grizzly Report noted that Gaussin's annual revenue at the time of roughly 10.2 million euros did not justify the Company's claims. Further, Gaussin and its CEO subsequently received fines from French regulator Financial Markets Authority Sanctions Commission for issuing false statements to investors, and Gaussin has gone bankrupt.

https://grizzlyreports.com/mvst/.

[4] *Id.*

[5] *Id.*

[6] *Id.*

103. On this news, the Company's stock price declined by $0.01, or roughly 0.3%, from a price per share of $3.91 at the close of trading on June 24, 2025 to close at $3.90 on June 25, 2025.

***August 1, 2025 Current Report***

104. The truth continued to emerge on August 1, 2025, when the Company filed a current report on Form 8-K with the SEC to announce the departure of Defendant Schultz from his role as CFO of the Company. This announcement was made just over three months after Defendant Schultz had joined the Company as CFO and provided no explanation as to the circumstances of his departure. The Company's current report filed on August 1, 2025 merely stated that "[o]n July 29, 2025, Carl T. (Pat) Schultz ceased to be employed as Chief Financial Officer of Microvast Holdings, Inc."

105. On this news, the Company's stock price declined by $0.30, or roughly 9.9%, from a price per share of $3.02 at the close of trading on August 1, 2025 to close at $2.72 on August 4, 2025. However, the Individual Defendants continued to obfuscate the true nature of the Company's inability to complete the Huzhou Phase 3.2 Expansion as represented and to reach its previously stated margin guidance.

***August 11, 2025 Press Release and Earnings Call***

106. For example, on August 11, 2025 the Company issued a press release to announce its financial and operational results for the second quarter of 2025 (the "Q2 2025 Press Release"). The Q2 2025 Press Release quoted Defendant Wu as stating the following:

> Continuing to build upon our momentum, Microvast is charting an exceptional course. We delivered a record second quarter, with revenue reaching $91.3 million, marking a 9.2% year-over-year increase. This growth is matched with gross margin expansion to 34.7%. While we booked a GAAP net loss of $106.1 million, we also achieved a positive adjusted EBITDA of $25.9 million. ***These results are a testament to*** the increasing demand for our advanced battery solutions and ***the***

> ***effectiveness of our relentless focus on profitability and operational efficiency***," said Yang Wu, Microvast's Founder, Chairman, and Chief Executive Officer.

107. That same day, the Company hosted an earnings call to discuss its financial results for the second quarter of 2025 with investors and analysts (the "Q2 2025 Earnings Call"). During the Q2 2025 Earnings Call, Defendant Worthen discussed the Company's quarterly profitability, stating the following in relevant part:

> Turning to profitability. Our gross profit for the second quarter was $31.7 million, a 17% improvement over the same period last year, driven by our relentless focus on operational execution, increased utilization and cost controls. Our gross margin improved by 2.2 percentage points to 34.7%, up from 32.5% in Q2 2024. . . . Operating expenses decreased to $16.5 million for the quarter, compared to $126.7 million in Q2 2024, an 87% reduction year-over- year. This reduction across G&A, R&D and sales and marketing was largely due to reduced share-based compensation and previously implemented cost control measures.

108. Also during the Q2 2025 Earnings Call, Defendant Wu provided an update as to the remainder of the Company's 2025 outlook, stating the following in relevant part:

> For the remainder of 2025, our initial revenue guidance holds firm. We are targeting a year-over-year revenue increase of 18% to 25%, which put[s] our projected range between $450 million and $475 million. ***We are slightly updating our targeted full year gross margin from 30% to 32% as we are focusing on stronger performing, higher-margin products***. In our APAC operations, all eyes are on ***our Phase 3.2 expansion at the Huzhou facility, which we anticipate will come online later this year***. This additional capacity of up to 2 gigawatt-hour annually is a direct response to the robust customer demand for our solutions. Our development teams are also making significant progress on the next wave of advanced products. ***Our high-growth EMEA business is expected to maintain its strong momentum***, continuing to drive significant year-over-year revenue increases. We are actively pursuing new strategic partnerships to support both our current and upcoming product lines in the region.

109. During the Q2 2025 Earnings Call, Defendant Wu discussed the Company's margins, stating, *inter alia*, that "[***w***]***e remain laser-focused on*** achieving our priorities for the remainder of this year which are achieving positive cash flow, ***sustaining our strong margins*** and expanding our market reach through relentless, innovation and strategic collaboration."

110. The statements identified in ¶¶106-109 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) the Company overstated the activity and production levels at its facilities notably including the Huzhou Facility; (2) the Company would be unable to complete the Huzhou Phase 3.2 expansion by the end of 2025; (3) the Company would be unable to reach its margin targets; (4) as a result of its specialized ESS components, the Company would incur roughly $32.5 million in inventory impairment charges; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

***September 10, 2025 Proxy Statement***

111. The Company filed the 2025 Proxy Statement with the SEC on September 10, 2025. Defendants Wu, Pan, Tushe, Wong, and Ying solicited the 2025 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

112. The 2025 Proxy Statement called for Microvast shareholders to, *inter alia*: (1) re-elect Defendant Ying to the Board for a term of three years; and (2) ratify Deloitte Touche Tohmatsu Certified Public Accountants LLP as Microvast's independent registered public accounting firm for the fiscal year ending December 31, 2025.

113. Regarding the Board's risk oversight functions, the 2025 Proxy Statement stated the following:

> Our Audit Committee is responsible for overseeing our risk management process. Our Audit Committee focuses on our general risk management strategy and the most significant risks facing us and oversees the implementation of risk mitigation strategies by management. Our Audit Committee is apprised of particular risk management matters in connection with its general oversight and approval of corporate matters and significant transactions.

> Our Compensation Committee is principally responsible for establishing, overseeing and administering our compensation plans and policies for our executive officers, including our equity incentive plans. Our Compensation Committee is also responsible for overseeing risks related to our compensation programs and practices. Our Compensation Committee has assessed the risk associated with our compensation policies and practices for our employees and determined that the risks associated with such policies and practices are not reasonably likely to have a material adverse effect on us. Our Compensation Committee utilizes compensation practices that it believes discourage our employees from excessive risk-taking that could be reasonably likely to have a materially adverse effect on us.

114. Regarding Microvast's "Commitment to Sound Corporate Governance," the 2025 Proxy Statement stated the following:

> We are committed to adhering to corporate governance practices that meet applicable U.S. corporate governance standards. Our Board has adopted guidelines that serve as a flexible framework within which our Board and its committees operate (the "Corporate Governance Guidelines"). These Corporate Governance Guidelines cover a number of areas including the size and composition of the Board, board membership criteria and director qualifications, director responsibilities, board agenda, meetings of independent directors, committee responsibilities and assignments, board member access to management and independent advisors, director communications with third parties, director compensation, director orientation and continuing education, evaluation of senior management and management succession planning.

115. The 2025 Proxy Statement also stated that Microvast "adopted a code of ethics applicable to [the] directors, officers and employees."

116. The 2025 Proxy Statement was materially misleading because it failed to disclose that: (1) contrary to the 2025 Proxy Statement's descriptions of the Audit Committee's risk oversight responsibilities, the Audit Committee was not adequately exercising these functions, was causing or permitting the Company to issue false and misleading statements to the investing public, and thus the Individual Defendants on the Board were breaching their fiduciary duties; and (2) the Individual Defendants on the Board who were breaching their fiduciary duties were improperly

interested in the re-election of Defendant Ying to the Board to allow him to continue breaching his fiduciary duties to the Company.

117. The 2025 Proxy Statement also failed to disclose that: (1) the Company overstated the activity and production levels at its facilities notably including the Huzhou Facility; (2) the Company would be unable to complete the Huzhou Phase 3.2 expansion by the end of 2025; (3) the Company would be unable to reach its margin targets; (4) as a result of its specialized ESS components, the Company would incur roughly $32.5 million in inventory impairment charges; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

118. As a result of Defendants Wu, Pan, Tushe, Wong, and Ying causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendant Ying to the Board for a term of three years, allowing him to continue breaching his fiduciary duties to the Company; and (2) ratify Deloitte Touche Tohmatsu Certified Public Accountants LLP as independent auditor for the fiscal year ending December 31, 2025.

***November 10, 2025 Press Release and Earnings Call***

119. The truth continued to emerge on November 10, 2025, when the Company issued the Q3 2025 Press Release. The Q3 2025 Press Release disclosed that the additional production capacity from the Huzhou Phase 3.2 Expansion would not come online until the end of the year, stating the following in relevant part:

> 2025 Outlook: . . . The Company is updating gross margin outlook for full year 2025 from 32% to a target range of 32% to 35%; The Company expects to finish installation and commissioning of production equipment for our Huzhou Phase 3.2 expansion by year-end ***with initial production to follow***, increasing our capacity to meet strong customer demand[.]

120. That same day, the Company hosted an earnings call to discuss its financial results for the third quarter of 2025 with investors and analysts (the "Q3 2025 Earnings Call"). During the Q3 2025 Earnings Call, Defendant Wu provided an update as to the timeline for the Huzhou Phase 3.2 Expansion, stating the following in relevant part:

> I'm pleased to report that we are in the final stages of installing and commissioning the production equipment with completion targeted for year-end, this expansion is critically important as Phase 3.2 is anticipated to add up to 2 Gigawatt hour of annual production capacity. The strategic timing of this expansion is intended to directly address existing market demand and position us to capture upcoming opportunities. ***We anticipate this new line initial production to begin in Q1 2026***. This expansion is a major step forward, securing our foundation for continued growth in 2026 and beyond.

121. On this news, the Company's stock price declined by $0.50, or roughly 10%, from a price per share of $4.98 at the close of trading on November 10, 2025 to close at $4.48 on November 11, 2025. However, the Individual Defendants continued to obfuscate the true nature of the Company's inability to complete the Huzhou Phase 3.2 Expansion as represented and to reach its previously stated margin guidance.

122. For instance, the Q3 2025 Press Release quoted Defendant Wu concerning the Company's gross margin for the quarter, stating the following in relevant part:

> Microvast is on an impressive trajectory, achieving a record third quarter with revenue of $123.3 million, a 21.6% increase year-over-year. Our gross margin rose to 37.6%, reflecting continued improvements in efficiency and product mix. While we booked a GAAP net loss of $1.5 million, we also delivered a positive adjusted EBITDA of $21.9 million, demonstrating the growing demand for our innovative battery solutions and the tangible results of our focus on profitability and operational excellence[.]

123. The Q3 2025 Press Release also noted that the "Company [was] updating [its] gross margin outlook for full year 2025 ***from 32% to a target range of 32% to 35%***[,]" stating, *inter alia*, "2025 Outlook: . . . The Company is updating gross margin outlook for full year 2025 from 32% to a target range of 32% to 35%[.]"

124. Likewise, during the Q3 2025 Earnings Call Defendant Wu discussed the Company's outlook for the remainder of the year, stating the following in relevant part:

> Please turn to Slide 15, which provides a summary of our outlook for the rest of the year. We are pleased to affirm our initial annual revenue guidance, which positions our projected revenue in the range of $450 million to $475 million. Due to our focus on stronger performing segments and a successful margin expansion efforts, ***we are also raising our full year gross margin target from 32% to a new range of 32% to 35%***. . . . We expect a strong sales growth for the year, and our development teams are making significant progress on the next wave of advanced products. ***Our EMEA business is expected to maintain momentum***.

125. The statements identified in ¶¶ 122-124 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) the Company overstated the activity and production levels at its facilities notably including the Huzhou Facility; (2) the Company would be unable to complete the Huzhou Phase 3.2 expansion by the end of 2025; (3) the Company would be unable to reach its margin targets; (4) as a result of its specialized ESS components, the Company would incur roughly $32.5 million in inventory impairment charges; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

## THE TRUTH FULLY EMERGES

***March 16, 2026 Form 10-K, Press Release, and Earnings Call***

126. The truth fully emerged on March 16, 2026, when the Company filed the Q4/FY 2025 Press Release. The Q4/FY 2025 Press Release reported the Company's revenue for the fourth quarter of 2025 as $96.5 million, equivalent to a 15% year-over-year decrease and well below the consensus estimate of $136.4 million.

127. The Q4/FY 2025 Press Release further stated that results were due to "regulatory shifts in South Korea and delays in customer platform ramp-up" in Europe, the Middle East, and Africa. The Q4/FY 2025 Press Release also disclosed that the Company's gross margin declined roughly 1% for the quarter, and attributed the results to "inventory impairment charges," stating the following in relevant part:

> Gross margin decreased to 1.0%, compared to 36.6% in Q4 2024, this change was primarily attributable to inventory impairment charges, which negatively impacted our gross margin by 30.1 percentage points; Non-GAAP adjusted gross margin decreased to 1.0%, compared to 36.7% in Q4 2024.

128. The same day, the Company filed the 2025 10-K which noted that the $32.5 million inventory impairment charge that resulted in the Company missing its gross margin guidance was derived from ESS inventory that "was specifically manufactured for a customer and did not generate any associated revenue during 2025."

129. Also on March 16, 2026, the Company hosted the Q4/FY 2025 Earnings Call. During the Q4/FY 2025 Earnings Call, Defendant Worthen discussed inventory impairment charge noted in the 2025 10-K above, stating the following in relevant part:

> Full year gross profit reached $122.1 million. This resulted in full year gross margin of 28.6% compared to 31.5% in 2024. This change was primarily attributable to $32.5 million in inventory impairment charge related to specialized ESS components, which negatively impacted our gross margin by 7.6 percentage points.

130. In addition, during the Q4/FY 2025 Earnings Call Defendant Wu provided another update as to the progress of the Huzhou Phase 3.2 Expansion, stating the following in relevant part:

> In APAC, while we navigated a regulatory environment in Korea, we are focused on a long-term via our Huzhou Phase 3.2 expansion, which is expected to bring additional capacity online in 2026. . . . [O]ur Huzhou Phase 3.2 project is progressing well with clean rooms and utility equipment already in operation. Trial production for our 55 amp-hour cell has begun on the electrode section, assembly and formation, and no-load test has started. This expansion is a critical component

> of our growth strategy as Phase 3.2 is expected to add up to 2 gigawatt hour of annual production capacity . . . . [The Huzhou Phase 3.2] expansion remains our primary operational catalyst for the year. We are on track to achieve serial production in 2026. Phase 3.2 is a critical milestone that brings online the capacity necessary to meet upcoming demand for our next-generation cell technology.

131. On this news, the Company's stock price declined by $0.79, or roughly 34.2%, from a price per share of $2.31 at the close of trading on March 16, 2026 to close at $1.52 on March 17, 2026.

## DAMAGES TO MICROVAST

132. As a direct and proximate result of the Individual Defendants' misconduct, Microvast will lose and expend many millions of dollars.

133. Such expenditures include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

134. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

135. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law; and payments of any fines or settlement amounts associated with the Company's violations.

136. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached

their fiduciary duties to the Company, including lucrative insider trading conducted by one of the Individual Defendants.

137. As a direct and proximate result of the Individual Defendants' conduct, Microvast has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

**DERIVATIVE ALLEGATIONS**

138. Plaintiff brings this action derivatively and for the benefit of Microvast to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholders, directors, and/or officers of Microvast, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act.

139. Microvast is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

140. Plaintiff is, and has been at all relevant times, a shareholder of Microvast. Plaintiff will adequately and fairly represent the interests of Microvast in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

**DEMAND FUTILITY ALLEGATIONS**

141. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

142. A pre-suit demand on the Board of Microvast is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following five individuals: Defendants

Wu, Pan, Tushe, Wong, and Ying (the "Director Defendants"). Plaintiff needs only to allege demand futility as to three of the five Directors Defendants that were on the Board at the time of the filing of this complaint.

143. Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make misleading statements and omissions of material fact, all of which renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

144. In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly caused or permitted Microvast to issue materially false and misleading statements. Specifically, the Director Defendants caused Microvast to issue false and misleading statements which were intended to make Microvast appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

145. Additional reasons that demand on Defendant Wu is futile follow. Defendant Wu founded Microvast in 2006 and has since served as Microvast's CEO and Chairman of the Board. Previously, Defendant Wu served as President of Microvast from October 2006 to April 14, 2022, from January 10, 2023 to August 3, 2023, and from February 5, 2024 through April 17, 2024. Defendant Wu is also a controlling shareholder of Microvast. As such, the Company provides Defendant Wu with his principal occupations for which he receives lucrative compensation. Thus,

as the Company admits, he is a non-independent director. As the Company's highest officer, he conducted little, if any, oversight the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. Defendant Wu also solicited the 2025 Proxy Statement, which was materially false and misleading and resulted in shareholders voting, *inter alia*, to re-elect Defendant Ying to serve on the Board for a term of three years, thereby allowing him to continue breaching his fiduciary duties to the Company. Furthermore, Defendant Wu is a defendant in the Securities Class Action. For these reasons, Defendant Wu breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

146. Additional reasons that demand on Defendant Pan is futile follow. Defendant Pan has served as a Company director since October 18, 2024. Defendant Pan currently serves as the Chair of the Compensation Committee, as the Chair of the Nominating and Corporate Governance Committee, and as a member of the Audit Committee. Defendant Pan receives sizable compensation for her role as a Company director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, during the Relevant Period, she failed to correct the false and misleading statements alleged herein. Defendant Pan also solicited the 2025 Proxy Statement which was materially false and misleading and resulted in shareholders voting, *inter alia*, to re-elect Defendant Ying to serve

on the Board for a term of three years, thereby allowing him to continue breaching his fiduciary duties to the Company. Moreover, Defendant Pan's insider sales, made with the knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme. For these reasons, Defendant Pan breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore excused.

147. Additional reasons that demand on Defendant Tushe is futile follow. Defendant Tushe has served as a Company director since October 18, 2024. Defendant Tushe has also served as the Company's President since April 18, 2024, as the Company's General Counsel since March 15, 2023, and as the Company's Corporate Secretary since May 8, 2023. As such, the Company provides Defendant Tushe with her principal occupations for which she receives lucrative compensation. Thus, as the Company admits, she is a non-independent director. As a trusted Company director, she conducted little, if any, oversight into the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, during the Relevant Period, she failed to correct the false and misleading statements alleged herein. Defendant Tushe also solicited the 2025 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to re-elect Defendants Ying to serve on the Board for a term of three years, thereby allowing him to continue breaching his fiduciary duties to the Company. For these reasons, Defendant Tushe breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore excused.

148. Additional reasons that demand on Defendant Wong is futile follow. Defendant Wong has served as a Company director since July 23, 2021. Defendant Wong currently serves as the Chair of the Audit Committee, as a member of the Compensation Committee, and as a member of the Nominating and Corporate Governance Committee. Defendant Wong receives sizable compensation for his role as a Company director. As a trusted Company director, he conducted little, if any, oversight into the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Defendant Wong also solicited the 2025 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to re-elect Defendant Ying to serve on the Board for a term of three years, thereby allowing him to continue breaching his fiduciary duties to the Company. For these reasons, Defendant Wong breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

149. Additional reasons that demand on Defendant Ying is futile follow. Defendant Ying has served as a Company director since July 23, 2021. Defendant Ying also serves as a member of the Audit Committee, as a member of the Compensation Committee, and as a member of the Nominating and Corporate Governance Committee. Defendant Ying receives sizable compensation for his role as a Company director. As a trusted Company director, he conducted little, if any, oversight into the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In

addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Defendant Ying also solicited the 2025 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to re-elect himself to serve on the Board for a term of three years, thereby allowing him to continue breaching his fiduciary duties to the Company. For these reasons, Defendant Ying breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

150. Additional reasons that demand on the Board is futile follow.

151. Defendants Wong (as Chair), Pan, and Ying (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Ethics. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

152. In violation of the Code of Ethics, the Director Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law,

including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Ethics by failing to act with integrity; failing to avoid conflicts of interest; failing to ensure the Company's disclosures were accurate; failing to ensure the Company complied with applicable laws, rules, and regulations; and failing to promptly report known violations of the Code of Ethics and the law. Thus, the Director Defendants breached the Company's own Code of Ethics, are not disinterested, and demand is excused as to them.

153. Microvast has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Microvast any part of the damages Microvast suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

154. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

155. The acts complained of herein constitute violations of fiduciary duties owed by Microvast's officers and directors, and these acts are incapable of ratification.

156. The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Microvast. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Microvast, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

157. If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Microvast to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

158. Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least three of the Directors Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
**Against Defendants Wu, Pan, Tushe, Wong, and Ying for Violations of Section 14(a) of the Exchange Act**

159. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

160. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

161. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

162. Under the direction and watch of Defendants Wu, Pan, Tushe, Wong, and Ying, the 2025 Proxy Statement failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Audit Committee's risk oversight functions, the Audit Committee was not adequately exercising these functions and was causing or permitting the Company to issue false and misleading statements.

163. The 2025 Proxy Statement was also materially misleading because it failed to disclose, *inter alia*, that: (1) the Company overstated the activity and production levels at its facilities notably including the Huzhou Facility; (2) the Company would be unable to complete the Huzhou Phase 3.2 expansion by the end of 2025; (3) the Company would be unable to reach its

margin targets; (4) as a result of its specialized ESS components, the Company would incur roughly $32.5 million in inventory impairment charges; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

164. Defendants Wu, Pan, Tushe, Wong, and Ying knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the 2025 Proxy Statement, including but not limited to, the re-election of a director.

165. The false and misleading elements of the 2025 Proxy Statement led Company shareholders to vote to, *inter alia*: (1) re-elect Defendant Ying to the Board for a term of three years, allowing him to continue breaching his fiduciary duties to the Company; and (2) ratify Deloitte Touche Tohmatsu Certified Public Accountants LLP as independent auditor for the fiscal year ending December 31, 2025.

166. The Company was damaged as a result of Defendants Wu's, Pan's, Tushe's, Wong's, and Ying's material misrepresentations and omissions in the 2025 Proxy Statement.

167. Plaintiff, on behalf of Microvast, has no adequate remedy at law.

## SECOND CLAIM
## Against the Individual Defendants for Breach of Fiduciary Duties

168. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

169. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Microvast's business and affairs.

170. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

171. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Microvast.

172. In breach of their fiduciary duties owed to Microvast, the Individual Defendants willfully or recklessly caused the Company to make false and misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company overstated the activity and production levels at its facilities notably including the Huzhou Facility; (2) the Company would be unable to complete the Huzhou Phase 3.2 expansion by the end of 2025; (3) the Company would be unable to reach its margin targets; (4) as a result of its specialized ESS components, the Company would incur roughly $32.5 million in inventory impairment charges; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

173. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

174. Also in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate system of oversight, disclosure controls and procedures, and internal controls, while one

of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $34,778.

175. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Microvast's securities.

176. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

177. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

178. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Microvast has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

179. Plaintiff, on behalf of Microvast, has no adequate remedy at law.

## THIRD CLAIM
## Against the Individual Defendants for Unjust Enrichment

180. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

181. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Microvast.

182. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Microvast that was tied to the performance or artificially inflated valuation of Microvast or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

183. Plaintiff, as a shareholder and a representative of Microvast, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

184. Plaintiff, on behalf of Microvast, has no adequate remedy at law.

## FOURTH CLAIM
## Against the Individual Defendants for Abuse of Control

185. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

186. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Microvast, for which they are legally responsible.

187. As a direct and proximate result of the Individual Defendants' abuse of control, Microvast has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

188. Plaintiff, on behalf of Microvast, has no adequate remedy at law.

**FIFTH CLAIM**
**Against the Individual Defendants for Gross Mismanagement**

189. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

190. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Microvast in a manner consistent with the operations of a publicly held corporation.

191. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Microvast has sustained and will continue to sustain significant damages.

192. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

193. Plaintiff, on behalf of Microvast, has no adequate remedy at law.

**SIXTH CLAIM**
**Against the Individual Defendants for Waste of Corporate Assets**

194. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

195. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

196. In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

197. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Microvast to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

198. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

199. Plaintiff, on behalf of Microvast, has no adequate remedy at law.

## SEVENTH CLAIM

## Against Defendants Wu, Khanbabi, Schultz, and Worthen for Contribution Under Sections 10(b) and 21D of the Exchange Act

200. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

201. Microvast and Defendants Wu, Khanbabi, Schultz, and Worthen are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to

Defendants Wu's, Khanbabi's, Schultz's, and Worthen's willful and/or reckless violations of their obligations as officers and/or directors of Microvast.

202. Defendants Wu, Khanbabi, Schultz, and Worthen, because of their positions of control and authority as officers and/or directors of Microvast, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Microvast, including the wrongful acts complained of herein and in the Securities Class Action.

203. Accordingly, Defendants Wu, Khanbabi, Schultz, and Worthen are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

204. As such, Microvast is entitled to receive all appropriate contribution or indemnification from Defendants Wu, Khanbabi, Schultz, and Worthen.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Microvast, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to the Company;

(c) Determining and awarding to the Company the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing the Company and the Individual Defendants to take all necessary

actions to reform and improve the Company's corporate governance and internal procedures to comply with applicable laws and to protect Microvast and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Microvast's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of the Company to nominate at least three candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e) Awarding the Company restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: August 24, 2026

Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/ Saadia Hashmi*
Saadia Hashmi
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: shashmi@thebrownlawfirm.net

**VERIFICATION**

I, Shua Yu Le Irving, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 21st day of August 2026.

Signed by:
Shua Yu Le Irving
515AA0C164F3430...

Shua Yu Le Irving